```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2
     * * * * * * * * * * * * * * *   )
3    UNITED STATES OF AMERICA,       )    Criminal Action
                                     )    No. 21-MJ-00092
4                    Plaintiff,      )
                                     )
5       vs.                          )
                                     )
6    COUY GRIFFIN,                   )    Washington, DC
                                     )    February 1, 2021
7                    Defendant.      )    3:43 p.m.
                                     )
8    * * * * * * * * * * * * * * *   )

9

10       TRANSCRIPT OF INITIAL APPEARANCE/DETENTION HEARING
                       CONDUCTED VIA ZOOM
11          BEFORE THE HONORABLE ZIA M. FARUQUI,
                UNITED STATES MAGISTRATE JUDGE
12

13

     APPEARANCES:
14
     FOR THE GOVERNMENT:        JANANI IYENGAR, ESQ.
15                              UNITED STATES ATTORNEY'S OFFICE
                                  FOR THE DISTRICT OF COLUMBIA
16                              555 Fourth Street, NW
                                Eleventh Floor
17                              Washington, DC 20530

18
     FOR THE DEFENDANT:         DAVID B. SMITH, ESQ.
19                              NICHOLAS D. SMITH, ESQ.
                                DAVID B. SMITH, PLLC
20                              108 North Alfred Street
                                First Floor
21                              Alexandria, Virginia 22314

22
     FOR PRETRIAL SERVICES:  CHRISTINE SCHUCK
23

24

25
```

```
 1     REPORTED BY:              LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
 2                               United States District Court for the
                                   District of Columbia
 3                               333 Constitution Avenue, NW
                                 Room 6706
 4                               Washington, DC 20001
                                 (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              THE COURTROOM DEPUTY:  This is Magistrate Case

2     21-92, the United States versus Couy Griffin.

3              The Defendant is present by video.

4              Janani Iyengar representing the Government; David

5     Smith and Nicholas Smith representing the Defendant.

6              Pretrial Services is Christine Schuck.

7              This matter is set for an initial appearance and

8     detention hearing.

9              Mr. Griffin?  Can you hear me, Mr. Griffin?

10             THE DEFENDANT:  Yes, ma'am.

11             THE COURTROOM DEPUTY:  Perfect.  Please raise your

12    right hand.

13             (Whereupon, the Defendant was duly sworn.)

14             THE COURTROOM DEPUTY:  Thank you.  You may put

15    your hand down.

16             THE COURT:  Thanks so much, Mr. Griffin.  Can you

17    see me?  This is Judge Faruqui right here.

18             THE DEFENDANT:  Yes, sir.  I see you, your Honor.

19             THE COURT:  Great.  Thank you so much.

20             So I am going to start by speaking to you first.

21    I'm going to ask you a few questions.  We'll kind of get

22    things situated for the proceeding today.

23             One of the things that's obviously tremendously

24    important is to have counsel formally appointed.  I know

25    both Mr. Smiths have been working diligently on your case

1    already.  I think they deserve to be recognized for what

2    they're doing.  Right now, they have not yet been formally

3    appointed.  That's something I'm going to do today, one of

4    the reasons this proceeding is really important.  But once

5    he is formally appointed, then I'm going to shift over and

6    talk to him.  I'll always give you an opportunity to speak

7    in these proceedings and make sure that you're being heard

8    and that, if you have questions, they'll be answered.

9         To that end, we're going to go ahead with the

10   procedure.  We've been doing them with video and audio.  It

11   allows us to do it more quickly, due to the ongoing

12   pandemic.  We've not had in-person hearings since, I

13   suspect, April of 2020, so it's been a while.  But I want to

14   make sure that you're able to hear what's going on, that

15   you're comfortable.  Obviously, it's always better to be in

16   person.  Just right now, things aren't safe, so we've been

17   doing this remotely.  I just want to make sure you've had a

18   chance to speak to Mr. Smith and you're comfortable going

19   forward today.

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  Great.  Thanks so much, Mr. Griffin.

22        So I'm going to start.  You know, you've been

23   sworn in.  So Ms. Lavigne-Rhodes has done that.  It's really

24   important.  I'm going to ask you some basic background

25   questions, very straightforward stuff.  But if for any

1    reason you feel like you're unsure or confused about

2    something I said or if you don't know if you can answer

3    truthfully, that's not a problem.  It only becomes a problem

4    if for some reason you can't honestly answer that question

5    and you still go forward.

6          And I understand.  It's the natural -- human

7    nature is to just answer questions put to you.  But that is

8    not something that is a good idea today.  Here, if you can't

9    answer something or you need a minute to think about it,

10   just let me know, because we have to be very careful.  We

11   don't want you to have separate perjury charges or contempt

12   charges in this proceeding.  So it's important that if you

13   don't understand something, if you're unsure, you say, "I

14   need a minute, Judge."  Okay?

15              THE DEFENDANT:  Sure.  Yes, sir.

16              THE COURT:  Great.

17              THE DEFENDANT:  I understand.

18              THE COURT:  And an incredibly important thing is

19   that I need a promise from you, which is that if we were in

20   the courtroom and you were unsure about something, you could

21   lean over to Mr. Smith and say, "Hey, I don't understand

22   what the Judge is doing" or, you know, you need to speak up

23   and say, "Judge, I've got a question" or "I need to speak to

24   my lawyer.  Can we step back or can" -- and we can clear the

25   courtroom.  All these things we would normally do, but we

1    can't do now.  Just because we're proceeding remotely

2    doesn't mean your rights are any less important or that your

3    questions are any less important.

4           So I need you to promise me that if you don't

5    understand what's going on or if you need to speak to your

6    lawyer, let me know.  We'll put you in a breakout room or

7    we'll make sure we slow down and make sure everything that's

8    going on is something that you understand.  Okay?

9           THE DEFENDANT:  Thank you.  I understand that.

10           THE COURT:  Great.

11           So I'm going to begin by asking, as I said, some

12    very basic background questions.  These are questions I ask

13    everybody who appears before me.  It's to make sure the

14    proceedings as they go forward are ones that you are able to

15    understand what's going on and that I feel like -- I feel

16    comfortable that we can go forward.

17           So I'll start with:  Could you please state your

18    name for the record.

19           THE DEFENDANT:  Yes, sir.  It's Couy Griffin.

20           THE COURT:  Thank you.

21           How old are you?

22           THE DEFENDANT:  47 years old.

23           THE COURT:  Great.

24           How far did you get in school?

25           THE DEFENDANT:  Some college.

1            THE COURT:  Great.

2            And have you taken any drugs, medicine or pills or

3    drank any alcohol in the last 24 hours that would make it

4    difficult for you to understand what's going on today?

5            THE DEFENDANT:  No, sir.

6            THE COURT:  Thank you.

7            So what we're going to do is I'm going to notify

8    you of the charges.  Then we're going to talk about your

9    rights; and part of that will be a right to counsel, so then

10   we'll talk to Mr. Smith.  And then the Government has asked

11   that you be detained pending trial, so we'll see if the

12   parties are ready for a detention hearing today.

13           If that is the case, then we'll have the detention

14   hearing.  It goes by what's called proffer, which means that

15   the parties don't put on witnesses.  They state what they as

16   officers of the Court believe the facts to be true and make

17   argument.  And you'll hear from the Government, Ms. Iyengar;

18   you'll hear from Mr. Smith; and you'll hear from as well

19   Pretrial Services.  It's the part of the court that makes

20   determinations about whether or not a person is -- whether

21   there are conditions or a combination of conditions that

22   will permit for their release.  So we'll start by going over

23   the charges.

24           So you've been charged by a criminal complaint

25   with one count of entering or remaining in a restricted

1       building in violation of 18 USC 1752(a)(1).  If you're

2       convicted of this, you can face a term of imprisonment of

3       not more than one year, a fine of $100,000 or both.  In

4       addition, the Court may impose a term of supervised release

5       of not more than one year.

6               The purpose of this hearing is to advise you of

7       this charge and your rights in relation to that.  The Court

8       will also determine, as I said, custody issues.

9               So let's start with your rights.  We have two

10      rights for today.  The first is the right to remain silent.

11      This means you're not required to make any statements or

12      give any statements to any law enforcement officer about the

13      offense for which you have been charged.  If you've said

14      something to them already, you need say no more today.

15      Anything you do say to a law enforcement officer can be used

16      against you in this proceeding or in future proceedings.

17              Does that make sense?

18              THE DEFENDANT:  Yes, sir.

19              THE COURT:  You also have the right to assistance

20      of an attorney to represent you in this case.  You may, if

21      you wish, hire your own lawyer; or if you cannot afford to

22      hire your own lawyer, I will appoint an attorney to

23      represent you at the government's expense.

24              Do you understand that right?

25              THE DEFENDANT:  Yes, sir.

```
 1                    THE COURT:  Great.

 2                    Do you wish to hire counsel on your own or do you

 3          wish to have me appoint Mr. Smith to be your counsel?

 4                    THE DEFENDANT:  I would like Mr. Smith to be my

 5          counsel.

 6                    THE COURT:  Okay.  Now, sometimes people fill out

 7          a financial affidavit.  Other times, more typically what we

 8          do is ask some questions.  And so I'm mindful of the fact

 9          that there's a public line, and I don't want to get too

10          in-depth into your personal finances.

11                    Mr. Smith, I'm sure you can follow up, should

12          there be any confusion or things like that, if there's

13          anything that comes to light.

14                    But I'll just ask you, Mr. Griffin, do you feel

15          like you are able to financially afford at this time -- that

16          you have legal funds that would allow you to afford a

17          counsel of your choice in this matter?  Or do you think that

18          you require the assistance of the Court in appointing

19          counsel?

20                    THE DEFENDANT:  No.  I'm sure I need the Court to

21          appoint counsel.  I can't afford counsel right now.

22                    THE COURT:  Okay.  I find that based on your

23          statement -- and I will always expect the parties -- they

24          have a continuing obligation to inform the Court if it's not

25          the case -- I will appoint counsel for you in this matter.
```

1    Mr. Smith is -- both Mr. Smiths are defense counsels.

2    Normally, you'd see federal public defenders.  There are so

3    many, frankly, cases right know, the federal public defender

4    is doing a phenomenal job of really managing all of its

5    cases.  We're also lucky to have in the District of Columbia

6    CJA-panel lawyers, so defense lawyers like both Mr. Smiths,

7    who work in your traditional criminal defense firms who also

8    as part of their service to the Bar and our community act as

9    appointed counsel.

10           So in this instance, Mr. Smith and Mr. Smith have

11   been identified by the Federal Public Defender's Office as

12   CJA lawyers who may be available.  So I'm going to ask them

13   now if they're available.  Does that make sense, kind of the

14   distinction between the Public Defender's Office and how

15   they fit into the system, Mr. Griffin?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Great.

18           So I'll speak with the Mr. Smith that I know

19   better, Mr. David Smith.  But I'm happy to hear from

20   Mr. Nicholas Smith.  Jump in.  I see David Smith is unmuted,

21   so I will go to him.

22           Mr. Smith, I want to first confirm that you are

23   available to be appointed in this matter and that, if so,

24   you would like to be.

25           MR. DAVID SMITH:  I am.  I would like to be.

1          THE COURT:  Thank you.

2          So we will go ahead and appoint you as counsel in

3    this matter to represent the Defendant.  The Court is very

4    appreciative of your service and all the CJA panel, all the

5    work they're continuing to do with all the cases that are

6    coming in.

7          So, Mr. Griffin, after this point forward, I'll

8    likely be speaking mostly to Mr. Smith.  That doesn't mean

9    that you can't speak; it just means that you have the right

10   to remain silent.  It's in your best interest if we have

11   Mr. Smith do the talking, because the things that he says

12   can't be used against you in future proceedings, whereas

13   what you say can.

14         You'll find that, like any person -- again, it's

15   human nature -- you want to respond when someone is saying

16   something.  But it may not be in your best interest.  So

17   let's make sure we let him do the talking; and we'll always

18   give you time to speak to him separately, if that's all

19   right.

20         THE DEFENDANT:  I understand.  Thank you.

21         THE COURT:  Just so we can avoid feedback, if

22   you're able to mute your monitor, you should see on the

23   bottom of the screen a mute option.  If you can do that,

24   that will allow the court reporter to make sure she can get

25   a good record.

1              Great.  Thank you.

2              Mr. Smith, before the detention hearing, the last

3     right I want to cover is the Defendant's right to full

4     evidence in this case, what's commonly described as

5     exculpatory evidence.  Congress amended Rule 5 recently and

6     stated that the Government must produce all that evidence.

7     And so pursuant to Rule 5(f), I'm ordering the United States

8     to produce all exculpatory evidence as that term is defined

9     in the case of *Brady versus Maryland* and its related cases.

10    Not doing so in a timely manner may result in sanctions,

11    including exclusion of evidence, adverse jury instructions,

12    dismissal of charges and contempt proceedings.

13             Ms. Iyengar, I'll turn to you next.  I wanted to

14    see if you are prepared to go forward with the detention

15    hearing today, if you continue to ask for detention and, if

16    so, under what basis, and if we should plan to go ahead by

17    proffer.

18             Oh, I think you're on mute, Ms. Iyengar.

19             MS. IYENGAR:  Yes, your Honor.  The Government is

20    asking to go forward with the detention hearing.  We're

21    seeking detention under 3142(f)(2)(A).  And the Government

22    submitted a [indiscernible] as part of its request for

23    detention, and so we would be asking to proceed by proffer

24    at this point.

25             THE COURT:  Thank you.

1          Mr. Smith, are you prepared to go forward as well?

2          MR. DAVID SMITH:  Yes.

3          THE COURT:   Thank you.

4          And we received extensive briefing from both

5   parties on this matter, which has been put on the docket.  I

6   am appreciative from both parties, the Government and the

7   defense side, that you all have briefed the issues so

8   thoroughly.

9          Please, Ms. Iyengar, why don't you proceed.

10         MS. IYENGAR:  Yes, your Honor.

11         So I think, as the Government laid out in the

12   motion that it submitted in favor of detention, the

13   Government believes the Defendant is a flight risk at this

14   point and therefore needs to be detained.  As we stated in

15   our -- the motion that we submitted, the Defendant does not

16   have any ties to the District of Columbia that the

17   Government is aware of.  He did cross state lines in order

18   to commit this offense.

19         And I understand the argument that the defense

20   made in the response to the Government's motion that the

21   Defendant did not actually breach the inside of the Capitol

22   that day; but the evidence that the Government has that was

23   laid out in the motion that was submitted clearly shows that

24   the Defendant did go past barriers that were set up, that it

25   was clear that the area that he was in, which was an area

1   that was restricted, and he was aware that that was an area

2   that was restricted.

3          Not to mention the fact that he then subsequently

4   went to the area where the Inauguration was held on January

5   20th during the course of the riot at the Capitol.

6          The other concern that the Government has in terms

7   of releasing the Defendant at this point is that he made a

8   statement during a public county council meeting that he was

9   going to return to the District of Columbia for the

10  Presidential Inauguration, that he was going to hold

11  basically a second rally and that he was bringing firearms

12  with him for that purpose.

13         And it is -- statements like that just are very

14  concerning to the Government about whether it's a good idea

15  to release the Defendant back into the community at this

16  point.

17         So I think, based on all of that information, the

18  Defendant's conduct in this case and the fact that he

19  doesn't have ties to the District, we don't believe it's a

20  good risk for release at this point.

21         THE COURT:  Thank you, Ms. Iyengar.

22         So as I understood it, in the Government's

23  detention memorandum you also made some requests with the

24  same facts, but also under the prong of the obstruction of

25  justice.  Is that right?  Or --

1            MS. IYENGAR:  Yes, your Honor.  We did also make

2       the same arguments, basically, with respect to the

3       obstruction issue as well.

4            THE COURT:  Thank you.

5            I'll go to Pretrial Services.  I believe

6       Ms. Schuck is the phone.  Ms. Schuck, are you there?

7            THE PRETRIAL SERVICES OFFICER:  Yes, your Honor.

8       Christine Schuck, Pretrial Services.

9            THE COURT:  Thank you, Ms. Schuck.  Again, as

10      always, I'll just take a moment to thank Pretrial Services

11      for the incredible work that they are doing right now with

12      the enormous filing of cases, the professionalism.  It is

13      always appreciated.  I've received a lot of emails in other

14      cases from you late over the weekend.  So thank you for your

15      continued hard work.

16           I'd like to hear on this matter Pretrial's

17      recommendation in terms of -- is it release or detention?

18      And putting it on the record.

19           THE PRETRIAL SERVICES OFFICER:  Based on the

20      Defendant's criminal history, Pretrial's recommendation is

21      to -- that he may be -- should the Court decide it's

22      appropriate, he may be released with the following

23      conditions:  that he report to Pretrial Services weekly by

24      phone; that he verify his address with Pretrial Services;

25      that he notify Pretrial Services in advance of all travel

1    within the continental United States, and the Court is to

2    approve all other travel.

3              He's not to possess any firearms.  He is to

4    contact Pretrial Services probably -- we would say by

5    February 4th for him to be interviewed by telephone because

6    we do not have any residential or personal, you know,

7    history on him.

8              Also, report as soon as possible to Pretrial

9    Services any contact with law enforcement, to include

10   arrests, questioning or traffic stops; not to obtain a

11   passport or other international travel document; surrender

12   any passports he may have to the Pretrial Services Agency

13   for the District of Columbia; to stay out of the District of

14   Columbia except for court or pretrial business or meetings

15   with his attorney; and not to illegally possess or use a

16   narcotic drug or other controlled substance.

17             Again, this recommendation is solely based on his

18   criminal history.

19             THE COURT:  Thank you, Ms. Schuck.

20             Mr. Smith, I'm happy to hear from you.

21             MR. DAVID SMITH:  Yes, your Honor.

22             First, I'd like to clear up some things that sort

23   of have arisen in this case and that I think are important

24   to clear up:

25             First of all, I want you to know that he took his

1    COVID test at the jail, and he's now in population rather

2    than in isolation.

3            We've already -- through the whole issue of

4    whether he should be present here, he's obviously present

5    and willingly present.

6            Here's an important thing:  You know, during the

7    prior hearing, you thought that he had refused to speak with

8    you on the cell phone.  But actually, he has explained to us

9    that he misunderstood what the jail guards were telling him

10   when they brought the cell phone into the cell for him to

11   use.  Like me, he's hard of hearing.  And the guards were --

12   the two guards were both wearing their masks, and he had

13   difficulty understanding what they were saying because of

14   the hearing problem and the guards' masks.  And he thought

15   that they were telling him there was a call from a lawyer

16   who wished to represent him.  And that's why he said, "I

17   don't want to talk to him" and, you know, "I want to talk to

18   my son," his 7-year-old son.

19           THE COURT:  Mr. Smith, I don't want to interrupt,

20   because I appreciate, as I said, your thoroughness and your

21   diligence.

22           You don't need to explain to me, frankly, if --

23   well, as a preliminary matter, I'm happy to hear that the

24   Defendant has been able to take the steps that were under

25   his control to get out of isolation, because I think that,

1    as you describe, it was a very challenging and difficult

2    situation he was in.  Obviously, I think the jail staff is

3    limited in what they can do when someone may have COVID that

4    comes in.  They have to protect the other folks in the

5    prison as well as themselves.

6          But it's -- I'm happy to hear the Defendant is

7    out, I mean, in the general population now and that he has

8    been tested.  That in my mind makes a lot of sense.

9          And I certainly do not hold against him anything

10   that happened in the previous hearings.  I think it's very

11   easy, frankly, to be confused as to what's going on or

12   confronted; and that at the end of the day, as long as the

13   Defendant's respectful now, which he has demonstrated

14   clearly that he is, that is for the past and of no matter at

15   the moment.

16          So I certainly [indiscernible] from that.  I would

17   not be at my best in those circumstances.  So I do not

18   expect anyone else.  I hold everyone to at least the minimum

19   standard of:  What can I do or what would I do walking in

20   the Defendant's shoes?  So there's no concern on my end for

21   that at all.  I am solely focused on the arguments that the

22   Government has made today.

23          MR. DAVID SMITH:  Thank you very much, your Honor.

24          So turning now to the detention issues:  As you

25   know, we filed a pretty comprehensive 22-page brief on

1      January 27.  And I'm sure the Court has read it, so I don't

2      need to repeat everything I said in that memo.

3                  THE COURT:  One second, Mr. Smith.

4                  Ms. Schuck, can you mute your line?  We're just

5      getting some feedback from your line.

6                  THE PRETRIAL SERVICES OFFICER:  I was muted, your

7      Honor.

8                  THE COURT:  It's still coming over to you, saying

9      that there's background noise there.  If you could just try

10     again, I'd appreciate it.  If not, no worries.

11                 Mr. Smith, continue.

12                 MR. DAVID SMITH:  Thank you, your Honor.

13                 And I would note that the Government has not

14     responded to our brief in writing.  They haven't filed a

15     reply, although there was time to do so.

16                 So mainly our arguments really stand completely

17     unrebutted.  And I just wanted to note that for the record,

18     I'm not going to waste time.  I'm just going to briefly

19     summarize why the Government's request for detention clearly

20     fails the test.

21                 So first, let's talk about a few facts here.

22     Unlike many of the other people who have received a lot of

23     media attention, which I've been able to read in the

24     newspapers, Mr. Griffin is only charged with a single

25     misdemeanor offense, whereas in other cases the Defendants

1    have been charged with multiple offenses that are much more

2    serious than the offense he's charged with.

3            And I have read in the *Washington Post* -- and I

4    think we cited this article in our brief -- the Defendants

5    who have been charged with the misdemeanor offense that

6    Mr. Griffin has been charged with have on a number of

7    occasions been given pretrial diversion or, if they pled

8    guilty or were convicted after trial, they received a very

9    short sentence, sometimes shorter than the amount of time

10   Mr. Griffin has already been in custody at the DC Jail.

11           So why is any of that important?  Well, for one

12   thing, it certainly suggests that he would be very foolhardy

13   if he were to flee, as the Government says there's a serious

14   risk of him fleeing.  I think that's completely unsupported

15   by the facts in the case.

16           As Probation just said, he has no criminal record

17   except for a very old DUI.  He's lived his entire life in

18   Southern New Mexico.  He has a loving family.  He is an

19   elected official of the county in which he lives.  In other

20   words, he's part of the county government.  He's been

21   gainfully employed since the 1990s without any break that

22   I'm aware of.

23           And, I mean, luckily, you've had a chance to see

24   and speak with him.  He's not a crazy person, even though he

25   has made some, you know, unfortunate statements, which

1    without making those statements he probably wouldn't be

2    here.

3              [Unidentified voice coming over the video feed.]

4              MR. DAVID SMITH:  So -- I don't know who's

5    speaking.

6              But we cited the *Lemon* case from the DC Circuit, a

7    1983 decision, saying that statements such as the one that

8    Mr. Griffin made, which the Government is rightly concerned

9    about, cannot be considered for purposes of determining

10   whether to grant someone pretrial release.

11             And it's interesting:  The *Lemon* case cites

12   another case, *Williamson versus United States*.  It's a 1950

13   Second Circuit decision, which is a very interesting

14   decision.  The decision is by Supreme Court Justice Robert

15   Jackson, considered one of the greatest of all Supreme Court

16   justices.  He was on the Supreme Court at the time.  And

17   Mr. Williamson was -- had already been convicted in a Smith

18   Act case, where he was accused of seeking to overthrow the

19   United States government.  And he was -- he had petitioned

20   for cert to the Supreme Court.

21             And so Justice Jackson as part of the Second

22   Circuit panel, strangely, was writing an opinion on whether

23   he should get bail.  And in that opinion, which is cited by

24   the DC Circuit, Justice Jackson said that statements made by

25   the Defendant, which are similar or worse, perhaps, than

1    what Mr. Griffin said during a council -- during a meeting

2    of the Otero County government -- should not be considered,

3    must not be considered in deciding whether to grant bail.

4    In that case, it was bail pending a petition for certiorari.

5    The Defendant, Mr. Williamson, had already been convicted of

6    a serious offense under the Smith Act for which he could

7    have been imprisoned for decades, unlike Mr. Griffin, who's

8    facing a misdemeanor charge.

9            So I think that the decision in *Williamson* by

10   Justice Jackson is striking, I think, for the light it sheds

11   on this case because the Government, even though they're

12   rightfully concerned about the statement that he made in the

13   council, they are overreacting to it.  And I doubt that

14   they've read *Lemon* or *Williamson*, because they certainly

15   should discourage the Government from even seeking detention

16   in this case based on his statement, because that's really

17   all they have.

18           The fact that he doesn't live in the District of

19   Columbia is really insignificant.  And there really is no

20   other basis for detaining him.  There's no basis for finding

21   that he would be a risk of flight whatsoever.

22           And there's even, I mean, just as weak a case for

23   the second theory, which is that he would obstruct or

24   interfere with a witness against him or a juror.  I mean,

25   the Government made no effort to support that.  I note that

1    the Government didn't even mention that second theory until

2    you prompted them as to whether they were still relying on

3    that second theory.  The only thing that Ms. Iyengar

4    mentioned initially was the argument that Mr. Griffin is a

5    serious flight risk.  And he certainly is not a serious

6    flight risk.  There's really no support for that either.

7          So let's see.  There's really no factual or legal

8    basis for the Government's contentions.  And moreover, even

9    if there was concern that he could be a risk of flight, that

10   concern can certainly be eliminated by the conditions that

11   the Court is free to impose.

12          And we would suggest that the conditions that were

13   just proposed by the pretrial services officer, Ms. Schuck,

14   are sufficient, more than sufficient, to assure his

15   appearance in court whenever it's required.

16          And the statute, 3142(c), says conditions that

17   will reasonably assure his appearance.  You can never in any

18   case guarantee that a person will show up; and we made that

19   point in the brief.  Studies have shown that something like

20   1 to 1 and a half percent of individuals granted pretrial

21   release fail to show up.  And Mr. Griffin is certainly not

22   going to be one of that 1 percent or 1 and a half percent

23   that don't show up.

24          I just wanted to mention another thing:  If he was

25   to be denied release, he would fall behind on his mortgage

1    payments and his child support payments for his 7-year-old

2    son and he would not be able to continue to serve his

3    constituents in Otero County, New Mexico.  Those are

4    additional reasons to grant him pretrial release.

5             And if the Court has any questions about any of

6    this, I or Mr. Griffin will be happy to answer those

7    questions.

8             Thank you very much for hearing me out.

9             THE COURT:  Thank you, Mr. Smith.  I appreciate

10   both the depth of your research and pulling cases from quite

11   a long time ago.  I appreciate your advocacy.  I think it's

12   helpful to think about those things.  These are important

13   issues; and we have to dig deep into them to make sure we're

14   making the right decision ultimately, that I am.

15            That is also about the collateral consequences.

16   This is the most difficult part of a detention decision, is

17   that -- what happens to family members, what happens to

18   making mortgage payments, these things that make this such a

19   hard thing to do for magistrate judges as we sit here and

20   try to make the right decision about whether there are

21   conditions or a combination of conditions that can assure

22   the appearance of the Defendant and in this instance

23   preclude any obstruction of justice.  There's no easy

24   answer, because on all paths there are pitfalls and dangers.

25            And so I'll hear from Ms. Iyengar and see if

1    there's anything else she wants to add.

2            Ms. Iyengar, I will note that I didn't think

3    [indiscernible] was necessary in this.  I think the defense

4    has stated their basis for release and the Government has

5    stated their basis for detention.  I think that they are

6    [indiscernible].  I don't know that there is really much of

7    a factual dispute.  I think it's just:  How should the facts

8    be applied?  But I'm happy to hear -- please don't feel

9    obligated.  But if there's anything you'd like to add, I'm

10   happy to hear it.

11           MS. IYENGAR:  Yes, your Honor.

12           I don't think there's anything that I'd like to

13   add in terms of any argument to be made for detention.  I

14   think at this point we're just resting on the papers.

15           THE COURT:  Thanks so much, Ms. Iyengar.

16           Mr. Griffin, I spent a lot of time reading your

17   documents, reading the Government's, looking at the cases

18   that are similarly situated.  I think that's one thing that

19   we'll touch upon here.

20           You know, there's essentially two things normally

21   in a detention hearing we look at:  Normally we look at

22   dangerousness to the community.  Here, that's not something

23   that we're considering because of the charges that have been

24   brought.  The Government has not requested that you be

25   detained by that standard.

1          Rather, they ask that I find that there's no

2     condition or combination of conditions that will reasonably

3     assure your appearance in a future proceeding because you

4     are a serious risk of flight.  Not a risk of flight, not an

5     ordinary risk of flight, but a serious risk of flight.

6          In addition, they say that you pose an

7     obstruction-of-justice threat in this matter.  For those

8     reasons, they say that we should go through the four factors

9     of the Bail Reform Act, which is:  the history and

10    characteristics of the Defendant; the nature and

11    circumstances of the offense; the weight of the evidence;

12    and the danger to the community/the general flight risk.  So

13    we'll go through those there.  And I'll go through and

14    explain why I rule ultimately the way that I do rule and,

15    you know, as I go through that, how that factors into my

16    analysis.

17          Ultimately, my decision is not the final decision.

18    Chief Judge Howell remains in waiting if for any reason

19    either the Government or Mr. Smith -- if you do not approve

20    of my findings.  You have the opportunity to appeal to the

21    Chief Judge and seek her guidance.  She will review it; I

22    think she will take into consideration what I have to say,

23    but she will ultimately make her decision based on the law

24    and the facts as she sees fit.  She has had a few of these

25    recently, and I think she is always available to hear from

1    defendants, be it today, tomorrow, or from the Government,

2    whenever it is that they want to have a decision

3    reconsidered.

4         One thing I'll note before I go into the four

5    factors is in looking at similarly situated cases -- I think

6    Mr. Smith makes a compelling argument that we've looked --

7    we have to look at similarly situated cases.  We look at

8    similarly situated cases not just as to this one instance,

9    of a riot, what the Government has described in its

10   pleadings as an insurrection, what the defense describes as

11   the exercise of First Amendment rights.

12        There are those similarly situated cases.  There

13   are cases that came before me prior to these cases, which my

14   colleagues and I looked at, that involve people trying to

15   enter the premises of the White House, usually making it to

16   the Ellipse, not even past there, where they're stopped by

17   Secret Service officers.  So I looked to those cases and

18   looked overall at the panoply of criminal cases that have

19   come before me.

20        I think it's worth noting for the record that, as

21   Mr. Smith notes, in most cases -- his statistic is 77

22   percent of cases -- the Government asks for detention.  And

23   I think that his argument is that it's overkill, that

24   essentially the Government is always asking for it, so they

25   lose credibility because in fact only in 1 percent of cases

1    people do not appear or fail to appear.

2           I think it's important that we look at these

3    factors of these cases.  In these cases, the Government has

4    been taking a very measured approach.  I think there are

5    many people, particularly people who, maybe until

6    recently -- you know, it's interesting to see sort of how

7    people change their minds about things.  Until recently,

8    there was not quite the same feelings about detention and

9    incarceration as there are today.

10          But I stand today, you know, looking at the

11   literature and cases before me, and I see that the

12   Government is quite judicious in whether they're asking for

13   detention.  And that has to inure to their credit.  Where

14   they rarely ask for detention, in the instances that they

15   do, I really have to dig deep and think that:  Is this

16   something that we're taking the Government as -- they're

17   going by proffer, so we take them at their word -- that they

18   think there are conditions here that are unique?  And that's

19   what the Government is saying.

20          So, far from the 77 percent, from my just rough

21   estimate, it's certainly far less than 50 percent of cases,

22   maybe even less than a quarter of cases where the Government

23   has asked for detention in these matters.  So when they do

24   ask for detention, I think they're making a more powerful

25   claim.

1    I will now go through the four factors.  Before I

2    do, I think one thing I will note is, to me, the

3    Government's argument is that you have to boil it down.

4    Right?  What is it?  And at bottom, to me, is that this is

5    what the Government says:  On Page 7 of their brief, they

6    say:  If the Defendant denies the authority of the lawfully

7    elected President of the United States, whose election was

8    certified by the Congress of the United States, certainly he

9    would deny the authority of judicial officers.

10    So that, to me, appears to be the Government's

11    argument, is they believe that the Defendant does not --

12    [Unidentified voice coming over the video feed.]

13    THE COURTROOM DEPUTY:  Your Honor, I'm not sure

14    where that is coming from.

15    THE COURT:  We have your box lighting up,

16    Ms. Schuck, but I don't know if that's you there.

17    THE COURTROOM DEPUTY:  I don't think that's her.

18    I don't know where that's coming from.

19    THE COURT:  I see everyone else is muted.

20    Ms. Schuck, are you there?  Did you hear that?

21    THE PRETRIAL SERVICES OFFICER:  I didn't hear

22    anything, your Honor.  And I'm muted.

23    THE COURT:  Got it.  I don't know why it's going

24    back to you.

25    Ms. Lavigne-Rhodes, can you just go ahead and

```
1    mute?  And perhaps her line is getting crossed.  If we need

2    to, we'll just unmute Ms. Schuck.

3              THE COURTROOM DEPUTY:  Yes.  We'll see if that

4    helps.

5              THE COURT:  Okay.  We'll continue.

6              So, as I said, it appears to me that the

7    Government's main argument is that they believe that the

8    Defendant does not believe essentially in the legitimacy of

9    the current democratic government and that, because of that,

10   how can I fashion conditions or a combination of conditions

11   of release that I can reasonably believe that he will follow

12   if he does not believe in the authority of the people who

13   are in fact the duly elected and lawfully authorized

14   government?  So that seems to me to be their argument.

15             You know, they say the Defendant has no ties to

16   the Washington, DC, community; they make the other arguments

17   that we frequently see.  But that is not -- I don't think

18   that is what distinguishes, as it appears to me, this case

19   from the other Capitol riot cases.

20             What it appears to me to be is that --

21   Ms. Iyengar, is that a fair statement, do you think?  I

22   mean, it's in your brief.  But that is perhaps your

23   argument.  Is that fair?

24             MS. IYENGAR:  Yeah.  Well, I think that's

25   definitely a big part of the heart of our argument.  I think
```

1    that in addition to, you know, the statements that were made

2    and then the fact that he was subsequently arrested outside

3    of the Capitol Building when he returned to the District.

4    All of that taken together is really the heart of our

5    argument.

6              THE COURT:  Thank you, Ms. Iyengar.

7              So those are the four factors.

8              Mr. Griffin, I don't like to -- my colleagues and

9    everyone does think differently.  I will tell you up front

10   that, unfortunately, I don't find that release is

11   appropriate in this instance.  And I will describe why.

12   I'll make a record.  And you have the opportunity after you

13   hear my findings, as I said, to speak to your lawyer and

14   consider how you want to go forward in terms of seeking any

15   reconsideration either now, with me, or at times later with

16   the Chief Judge.

17             And so I will start with the nature and

18   circumstances of the offense.  The Chief Judge in the

19   *Barnett* case described what I think I have mentioned in

20   previous hearings, is that it's difficult to square the

21   title of these offenses and the punishment with the nature

22   of the offense.

23             The nature of the offense, you know, is something

24   that is quite [indiscernible].  It is what appears to be,

25   based on, again, the Government's proffer -- that's all I

1    can go by here -- is that this was an organized attempt to

2    stop the lawful administration of the democratic process.

3          The Defendant states in his opposition that he

4    believes that in fact even the elements of the crime might

5    not be met, because he states that there's no indication, on

6    Page 4 into Page 5 -- there's no indication that the

7    Defendant knew that the Capitol grounds was where a person

8    protected by the Secret Service was or would be temporarily

9    visiting.

10          I think that that of many things is beyond

11   implausible.  The Defendant and the people who came to march

12   on the Capitol on January 6th were well aware.  They did not

13   choose that date randomly.  It was because it was when the

14   Electoral College was being certified and when the

15   transition of power was at its crescendo.  The Vice

16   President was there and members of Congress were there, all

17   of whom certainly are known to be protected by the Secret

18   Service.

19          So the nature of this offense is not a simple

20   misdemeanor offense.  This is an offense that at bottom was

21   an attempt to stop democracy from moving forward because

22   people were unhappy about the results of an election.

23          Now, that -- they have a right to be unhappy.

24   They have First Amendment rights.  And Mr. Smith, I think,

25   has provided compelling reasons we have to consider and

1    protect those First Amendment rights.  That's absolutely the

2    case.

3            However, what is not the case is that people can

4    forcibly enter grounds where that process is ongoing and

5    attempt to stop it.

6            I think Ms. Iyengar is right that we do look to

7    the Defendant's statements, not the dangerousness or not to

8    limit his First Amendment rights.  We would never want to

9    chill that.  However, we do have to try to understand his

10   state of mind and understand if he's in a state of mind

11   where he could respect conditions or a combination of

12   conditions that I would impose.

13           Mr. Griffin states -- his counsel states on

14   Mr. Griffin's behalf he was never asked to leave the area by

15   police and he exited peacefully.

16           This is not a crime in which you get to enter as

17   far into the Capitol grounds as you like until you're told

18   not to.  And if you're doing it politely, that makes it no

19   less of a crime.  That is a crime.  It's not the means by

20   which you enter; it's the very fact that you entered.  These

21   are sacred institution of our nation, and they are not ones

22   in which people can just come either in a mob or singularly

23   go in and enter those areas without permission.

24           The statements in particular I think are

25   concerning because -- and I will discount -- the Government

1   in its detention memorandum raises what they describe as

2   inflammatory, racist advocacy.  I don't think that's

3   relevant, frankly, at all here.  The Defendant is entirely

4   within his rights to think any of those things that he wants

5   to.

6           However, where I have to then focus is on the

7   nature of the charged offense, which is the entering

8   unlawfully of the Capitol.  And then I look at the language

9   that the Defendant used previously and afterwards.  There is

10  evidence proffered by the Government that the Defendant

11  stated, quote, "The only good Democrat is a dead Democrat,"

12  unquote, before then saying afterwards that he didn't intend

13  that physically.

14          I don't give credit to that "I'm just saying that,

15  is all."  You don't get to say something and then say, "But

16  I didn't really mean it," because why did you say it, then?

17  Words do matter.  Words matter; facts matter.  Here we are,

18  and we have to measure the Defendant by the statements that

19  he says.

20          He did say -- I think that Mr. Smith provided some

21  context as to why he said he was going to exercise his

22  Second Amendment rights and carry his firearms back here,

23  because his life feels threatened.  In no way is that

24  acceptable.  People need to -- mobs are not okay on either

25  end.  People should never be threatened.  Their families

1   should never be threatened.  People should not be in a

2   situation where they feel they have to turn to firearms

3   because they're not safe.  That is unacceptable.

4         And so I understand and empathize, I think, why

5   the Defendant felt that way.  However, that is not the

6   statements that are of primary concern to me.  My primary

7   concern is that the Defendant said in a video that he posted

8   after the incident on January 6th that if the Second

9   Amendment rally on those same steps -- if that happened,

10  that's going to be, quote, "a sad day, because there's going

11  to be blood running out of that building.  But at the end of

12  the day, you mark my word, we will plant our flag on the

13  desk of Nancy Pelosi."

14        So I see again statements that to me indicate what

15  the Government has said, is that the Defendant's statements

16  show that he does not believe that this in fact was a lawful

17  government that's been in place.

18        You know, he makes statements about the election

19  being stolen by Chinese entities.  I don't know what that

20  means.  I know that [indiscernible] the Ellipse cases, when

21  someone makes statements like this that are demonstrably

22  false and that are in no way accurate that what happens is

23  we consider whether or not a person needs a mental health

24  evaluation.  And this is no different than people not

25  believing facts or science.  Simply, I have to evaluate

1    whether or not that person's competent.

2         Here, I believe the Defendant is competent.

3    Unfortunately, this is a prevailing, apparently, idea,

4    although false.  And so I don't think that he has competency

5    issues.  Of course, if there were any, I know the Government

6    and Mr. Smith would explore it.

7         But I go back to the nature and circumstances of

8    the offense.  Given those statements about the lack of

9    belief or faith that the Defendant has in this -- in the

10   United States government as it sits today, I don't

11   believe -- I look at essentially the nature of that offense.

12   And I think the nature of that offense is that he's

13   demonstrated that he believes that violence is on the table

14   and that the nature of the offense is exactly what it says

15   it was:  This was an attempt to overthrow the government

16   because he did not believe it was legitimate.

17        The next factor is the weight of the evidence.

18   The weight of the evidence in this case is strong.

19   Mr. Smith makes what I think is fair arguments to mitigate

20   the seriousness of it:  that there's no evidence that he did

21   go into the building, that he did not harm any police

22   officers.  There's no indication of that and the Government

23   has not proffered that.  So I can only go by what the

24   Government says.

25        But the Government did proffer that there's video,

1    and he also made admissions, that he went past the

2    barricade.  This is not an optional sort of thing.  When

3    there is a barricade up, you are not permitted to go

4    forward.  That is not for the Defendant's choice; that's not

5    for anyone's choice; it's not for my choice.  We all live in

6    a system of rules where we have to follow them.  And if we

7    don't, there are consequences.  Here, there's a consequence.

8    It is quite clear.

9          I don't think any reasonable person could believe

10   that, frankly, climbing up on the steps of the Capitol

11   Building and getting where the Defendant did was in any way

12   lawfully permissible.  I think the Defendant even understood

13   that it wasn't, but he felt that he was justified because he

14   thought that what he was doing was for a greater good.

15   Unfortunately, that is not the way that our democracy works.

16   You do not get to take things into your own hands.  You have

17   to follow the lawful process, just like everyone else.

18   People have lost elections before and we did not have this

19   sort of response.

20          So I think the weight of the evidence is strong in

21   favor of detention as to the first factor.

22          I think the history and characteristics of the

23   Defendant -- I've already covered it -- his statements

24   demonstrate to me a lack of faith and belief in the

25   legitimacy of this government.  Therefore, while his lack of

1    criminal history, or very minimal, you know, really minor

2    offenses that aren't ones one would normally consider, I

3    think those things inure to his benefit.

4            And it inures to his benefit the fact that he is

5    an elected representative.  He of all people understands the

6    beauty of the American democracy, the beauty of citizens

7    getting together and choosing who they want to represent

8    them and then living by the consequences of those elections.

9    He knows better than anybody.

10           And I credit him for his public service, and it's

11   something that should be commended.  However, in this

12   instance, the flip side, or these statements that he makes

13   about blood running out of the Capitol, threats to members

14   of Congress, stating that the only good Democrat is a dead

15   Democrat, all of those things demonstrate to me a history

16   and characteristics that warrant in favor of detention.

17           That is -- and the circumstances of this offense,

18   the unlawful entry into the Capitol Building, all of those

19   things demonstrate to me that his history and

20   characteristics are one where detention is required, because

21   there's no combination of conditions that will cause him to

22   follow through on my orders.  I don't believe that he will

23   believe that those orders are to be respected or followed.

24           Finally, as to dangerousness, I think I've already

25   covered that.  It's dangerousness of flight risk.  I think

1    that the reason is that which we've already stated, that

2    there is a real risk of flight.  You know, I don't think the

3    Defendant will follow through on my conditions if he

4    believes that I am part of this machine of the democratic

5    process or for whatever reason.  I don't know.  I can't

6    fathom what it is, because these are not logical thoughts

7    based in fact.  I don't know.

8            But all I can do is go on the facts of what his

9    actions have been, what his statements have been afterwards.

10   And, far from remorse, he doubled down and continued to

11   believe that what happened on January 6th was appropriate

12   and in fact that another rally was needed, and a rally that

13   only exponentially increased in terms of violence:  his

14   Second Amendment rights.

15           Defense counsel says:  Well, that rally never

16   happened.  But the rally never happened because of the

17   intervention of the National Guard.  I mean, Washington, DC,

18   was clearly a fortress, so it could not happen.  It was a

19   factual impossibility.  But that does not mean that the

20   Defendant did not still make statements that that was what

21   he wanted to do.  So for those reasons, I think there is a

22   danger.

23           I would note for the record I believe obstruction

24   of justice is -- rarely is appropriate.  But here, it is

25   also again a basis for detention, where a Defendant does not

1    believe in the rule of law and makes threats to people who

2    are inside the Capitol Building, presumably, or victims of

3    his crime.  I don't see how there is anything other than

4    obstruction.  Presumably, the people in the building that he

5    tried and cajole people to invade could be witnesses in this

6    matter.  And after, he was -- after the event happened, he

7    continued to make threats against them.  That sounds to me

8    like a classic threatening of a witness.

9         So I think obstruction -- I don't need to fall

10   back on that, but I do think for the record that that is a

11   basis for detention.

12        So for all of those reasons, I believe detention

13   is appropriate, as I stated.  You have the opportunity to

14   appeal that to Chief Judge Howell, that finding.

15        Ms. Iyengar, do we have a date for a preliminary

16   hearing in this matter?

17        MS. IYENGAR:  We have not agreed upon a date yet.

18        THE COURT:  Do you want to just -- the Defendant

19   was -- do you want to say the date that he was let go, by

20   the arrest date, or the initial appearance?  What date do

21   you want to go by, Ms. Iyengar?  Why don't we start with

22   that.

23        MS. IYENGAR:  If we can go by the initial

24   appearance date, that would be our preference.

25        THE COURT:  Mr. Smith, you tell me.  Do you

1    plan -- where do you believe we should go by?  And when are

2    you hoping to have the preliminary hearing, if you are

3    seeking to have one now or if you're seeking to continue

4    this and speak to the Government?  Why don't you let me know

5    what you want to do.

6            MR. DAVID SMITH:  I mean, your Honor, are you

7    prepared to have the preliminary hearing right now?  Is that

8    what you're saying?

9            THE COURT:  No.  The Government has asked for the

10   14 days, so I'm happy to give the Government 14 days.  The

11   Defendant was arrested --

12           Ms. Iyengar, when was the Defendant arrested?

13           MS. IYENGAR:  On --

14           THE DEFENDANT:  On the 17th.

15           MS. IYENGAR:  On the 17th.

16           THE COURT:  Thank you, Mr. Griffin.

17           So he was not able to have his initial appearance

18   until this date.  I've made a record as to the reasons why.

19   The Government has asked for its 14 days from today, so

20   they've asked to go to the 15th, Mr. Smith.  Can you let me

21   know if you want to do the preliminary hearing then or if

22   you're asking for before then?  Obviously, you'll need time

23   to get discovery and things like that together.

24           Mr. Griffin, the next hearing will be a

25   preliminary hearing.  That's where the Government has to

1   actually put on witnesses.  They can't just go by proffer.

2   They have to come and you get to put them to their paces,

3   cross-examine their witnesses.

4          And throughout all of this, I want to remind you

5   that the Constitution guarantees you a right to innocence,

6   which you do have, which means that myself and any district

7   judge who takes this matter believes you're innocent,

8   because the law states that.  Nothing that comes today --

9   those are simply detention decisions.  That's nothing a jury

10  would ever know and that's nothing that ever factors into a

11  judge's analysis as to whether or not you are guilty or

12  innocent, because we believe you are innocent.  The law says

13  that.

14         Mr. Smith, when can we have the preliminary

15  hearing, should you seek to have it?  Would you like

16  additional time to get discovery and/or time to speak to

17  Ms. Iyengar about the facts of the case?

18         MR. DAVID SMITH:  Well, could I ask that

19  Mr. Griffin be heard right now to let me and yourself know

20  what --

21         THE COURT:  Why don't we put you in a breakout

22  room so that you can speak to him, because I think that

23  would be better.  I don't want to put him on the spot and

24  then get him implicated in his right to silence.

25         So, Ms. Lavigne-Rhodes, can you put the Defendant

1    and both Mr. Smiths into a breakout room?

2            THE COURTROOM DEPUTY:  Absolutely, your Honor.

3            THE COURT:  So we'll be here, Mr. Smith.  We'll

4    have our camera off.  But you let us know when you're ready.

5            MR. DAVID SMITH:  Thank you, your Honor.

6            (Thereupon a recess was taken, after which the

7    following proceedings were had:)

8            THE COURTROOM DEPUTY:  Re-calling Magistrate Case

9    21-92, the United States of America versus Couy Griffin.

10           THE COURT:  Mr. Smith, I take it that hopefully it

11   was helpful for you to have an opportunity to speak with

12   your client.

13           Rule 5.1 indicates that it's 14 days from the

14   initial appearance.  So 14 days the Government has by right.

15   So the earliest we could have our preliminary hearing is

16   February 15th.  Obviously, we could set a status hearing for

17   that day and a preliminary hearing, jointly, and then you

18   can decide, you know, as to that date if that's what you

19   want or if you'd like to go longer.

20           So I'd like to hear from you what the Defendant

21   would like to do.

22           MR. NICHOLAS SMITH:  Yes, your Honor.  This is

23   Nicholas Smith.  I'll address both questions.  Good

24   afternoon.

25           THE COURT:  Good afternoon, Mr. Smith.

```
 1              MR. NICHOLAS SMITH:  Okay.  So we'd like February

 2       8th, actually, seven days, for the preliminary hearing.

 3       And --

 4              MR. DAVID SMITH:  Excuse me a second.

 5              The Judge just informed us that the Government has

 6       14 days as a right.

 7              MR. NICHOLAS SMITH:  I understand.

 8              So our request after having met with Mr. Griffin

 9       is to ask for this.

10              And the second thing we'd like to note are a

11       couple of -- we'd like to address some of the bases for

12       today's decision, just to make --

13              THE COURT:  Absolutely.  Yes.  Can we work

14       backwards and first talk about the date?  And then let's

15       come back to that.

16              MR. NICHOLAS SMITH:  Sure.

17              THE COURT:  As I understand it, Ms. Iyengar, I'm

18       looking at -- I'll go back to you.  It states under Rule 5.1

19       that the magistrate judge must hold the preliminary hearing

20       within a reasonable time but no later than 14 days after the

21       initial appearance if the Defendant is in custody.  So I

22       understand the law to indicate that by right you can go up

23       to 14 days.  That does not mean you have to.

24              I want to confirm.  I understand the Defendant's

25       request.  He is in custody.  He's been in custody for a
```

1    little while.  I want to confirm whether or not you can have

2    a preliminary hearing on the 8th.

3            Additionally, I want to know if there's any

4    indication that you have a grand jury to indict the case

5    before then, in which case this might moot all of this.  So

6    any information you can share with us would be helpful.

7            MS. IYENGAR:  Sure.

8            So I think we don't have any issue with having the

9    hearing on the 8th.  Because this is a misdemeanor and we

10   would just have to file an information, I think we can most

11   likely get that done before the 8th.

12           THE COURT:  Great.  Let's start with that.  Let's

13   set the preliminary hearing.  Mr. Nicholas Smith has made

14   the request on behalf of the Defendant.

15           Ms. Lavigne-Rhodes, can you put on my calendar for

16   February 8th a preliminary hearing?

17           And let's set it for, should we say, Mr. Smith, if

18   it's all right with you, how about 1:30?  Is that good?

19           MR. NICHOLAS SMITH:  Yes.  That's good.

20           MR. DAVID SMITH:  That's fine.  Yes.

21           THE COURT:  So that works for both Mr. Smiths.

22           Ms. Iyengar, does that work for you?

23           MS. IYENGAR:  Yes, your Honor.

24           THE COURT:  So, Mr. Griffin, we're going to go

25   ahead, as we talked about, with that preliminary hearing.

1       That's the hearing where you get to -- your lawyers get to

2       examine witnesses from the Government.  They have to prove

3       probable cause that you committed the crimes that they've

4       alleged.  They cannot simply rest on an affidavit from an

5       affiant who does not appear by facts that the Government

6       states.  They actually have to get up there and do the work

7       that the Constitution requires them to do.

8               And so now you've heard also from the Government

9       that they can charge your case before that.  If they do,

10      then the case will be assigned to a district judge.  That's

11      who you would go to before in a trial, likely.  Because it

12      is a misdemeanor, it can go to the magistrate judges by

13      consent.  In fact, many of them may do that.  Just because I

14      am presiding today does not mean it will go to me.  It will

15      go to any one judge of the magistrate judges randomly

16      assigned.  That ultimately is something you will speak to

17      your counsel about and make those decisions.  But if they

18      formally charge the case, there will be no preliminary

19      hearing.

20              So, Mr. Nicholas Smith, now I'm happy to come back

21      to hear anything that you want to add regarding my findings

22      as to detention.

23              MR. NICHOLAS SMITH:  Yes.  Thank you, your Honor.

24              And we understand that the Court has made its

25      decision.  But we thought it might still be useful to the

1      Court not just for the sake of the record, but just to

2      address a couple of the points, because this whole process

3      has been pretty quick.  There was no reply brief.

4           So the first point is that your Honor mentioned

5      that, to boil down the Government's position for detention,

6      it's that Mr. Griffin has a fundamental belief that -- in

7      the illegitimacy of the current government.  And there is

8      some support in the Government's proffer and its papers that

9      Mr. Griffin questioned the outcome of the election.

10          We think the relevant question here is whether

11     there's any evidence or proffer that Mr. Griffin has no

12     respect for or does not believe in the legitimacy of you,

13     your Honor, in the Court.  There is nothing in the record,

14     if your Honor searches it, and in the Government's proffer

15     to suggest that he does not have respect for the Court, that

16     he wouldn't return at the appropriate opportunity.  There's

17     nothing in the record to suggest that he doesn't have

18     respect for the judiciary.  I think, if anything, it might

19     be the opposite in the record.

20          The second point your Honor made is that this is

21     not merely a trespass case, this is not merely a misdemeanor

22     case, but that this is an organized attempt to overthrow the

23     government.

24          Your Honor, there's no charge or allegation in the

25     charging statement that this was an organized attempt to

1    overthrow the government on the part of this Defendant's

2    behalf.  So our position would be that that sort of surmises

3    based on public statements or the public record and would

4    not be a part of the Government's proffer or a part of the

5    Government's charging statement and would not be a basis for

6    denying detention.

7            Your Honor pointed out that in our bail

8    submission, the Defendant suggests that he may have not had

9    the relevant *mens rea* to commit the crime.  And your Honor

10   suggested that that does not seem to be the case, based on

11   the Government's proffer.

12           Mr. Griffin pointed out in his bail submission of

13   what the relevant elements of the offense are under 1752(c).

14   And those include knowledge that the area, the restricted

15   area in which he entered, was one of three very narrowly

16   defined restricted areas, including the White House, which

17   is not present; the Vice President residence, which is not

18   present here; and some area that's designated as an area

19   containing an event of special significance.

20           The Government has alleged that the area that

21   Mr. Griffin entered on July 6th was an area of special

22   significance or was so designated by any governmental

23   entity.  So what the Government [indiscernible] is an area

24   in which the Defendant knew that a person with Secret

25   Service protection would be at the time he entered the area.

1          It's not a statement of fact.  The charging

2     statement does not make this allegation, your Honor.  So

3     it's not an evidence of the Defendant's contempt of Court or

4     belief in the illegitimacy of government to point out what

5     the elements of the offense are.  And they haven't been

6     fully alleged.

7          As for the statement that there would be blood

8     coming out of the Capitol, I'm glad your Honor brought this

9     up, because this is a very important point in the

10    Government's brief.  The Government does accurately quote

11    Mr. Griffin's statement at one point that if there was a

12    Second Amendment rally at some indefinite time, there would

13    be blood from the Capitol.

14         We have no reason to believe right now that that

15    statement is inaccurate.

16         But, your Honor, the Government then strings that

17    statement together with a promise that Mr. Griffin is

18    returning to the Capitol to pursue that end.  And there's

19    just no evidence in the record to support that.  And I

20    think, your Honor, it's a little bit of an inappropriate

21    insinuation without any evidence to suggest that Mr. Griffin

22    is making a vow to return to the Capitol to shed blood when

23    there is no evidence to support that.

24         Your Honor, there's one more point that I think is

25    really important here, which is the *Lemon* case.  We raised

1    the DC Circuit case of *United States versus Lemon*.  I don't

2    have the citation right here handy.  But the DC Circuit is

3    pretty clear that statements that are First

4    Amendment-protected speech and especially core political

5    speech simply can't be the basis for the denial of bail.

6    The statement's pretty unequivocal.

7          And if we look at the law and citation and the

8    First Amendment protections for incitement, the statement

9    about blood or the caveated statements about Democrats

10   are -- they just clearly fall within First Amendment

11   protection.

12         So, you know, if we're kind of left without

13   anything in the record to suggest [indiscernible] apart from

14   those statements, there really isn't any element of the

15   Government's proffer that would suggest Mr. Griffin is not

16   going to show up.

17         And so, you know, if it's possible, we'd like to

18   discuss those points with your Honor, because we don't think

19   they're included in the Government's proffer.  But we

20   recognize that your Honor's made a decision.

21         THE COURT:  Thank you, Mr. Smith.

22         I think, again, you and your co-counsel have

23   really put a lot of thought into these issues and I think

24   you have put together both a legally interesting, but also a

25   factually compelling, case.

1           I'll respond to them.  I think that at this point

2     my decision remains the same; and I think that the

3     appropriate remedy, if you feel that this record reflects

4     that you want to have another person make a decision on

5     this, is to take it up with the Chief Judge.

6           I think I'll start with your first point, that the

7     Court is different than the executive branch and that the

8     Defendant respects the judiciary.

9           You know, I have to go by the proffer.  And so I

10    take what you say as fact and I take what the Government

11    says as fact as well.

12          What they do is you look at a symptom.  If there

13    are enough symptoms, it's part of a disease.  So here, in

14    this instance, they're saying there is one strong indication

15    that the Defendant does not believe in the legitimacy of the

16    government.  Right?  Not just narrowly the executive.

17    Right?  It is difficult to parse out there.

18          In addition to which, the fact that the Defendant,

19    they allege, went to the Capitol indicates at least from my

20    perspective -- I have to make logical inferences from the

21    facts -- that two-thirds of the government the Defendant

22    does not have -- does not believe is acting lawfully or

23    legitimately.

24          And so the Government states that their conclusion

25    is:  Why would the Defendant then, to the third branch of

1    the government, once it starts doing things that the

2    Defendant does not agree with or believe in, come to any

3    different conclusion than he did with the first two branches

4    of the government, that when they do not listen or do what

5    he views to be right that he unilaterally gets to decide

6    what is and is not right and go forward and make his own

7    decisions?

8              So I agree that he has not stated anything

9    explicitly that he has no lack of faith or belief in the

10   judiciary.  But implicitly, I think a logical inference is

11   that when someone tries to participate in what the

12   Government describes as an insurrection, that he does not

13   believe in the legitimacy of the government.  I think that

14   it's hard to believe how parts of the government can be

15   quarantined from that disease.  It's hard for me to

16   understand how the Defendant would not view that we are

17   just -- we, the Court, aren't part and parcel of the

18   problem -- that does not exist, for the record, again -- but

19   that in his mind does.

20             So for that reason, I think that still applies in

21   my mind, that how can I believe that there are conditions or

22   a combination of conditions that will function when he does

23   not believe in the people that are creating and promulgating

24   those rules?

25             You indicated there's no evidence that this was an

1    organized attempt to overthrow the government.

2            I think that in this case, the Defendant's

3    statements are quite clear.  You know, I don't have to look

4    to the simple reality of what occurred on January 6th.  I

5    can carve out what is the noise that the Defendant might

6    feel like and people have said about it and look only to his

7    statements.

8            His statement indicates that he was dissatisfied

9    with what happened on January 6th, that that was an attempt

10   to stop the stealing of the election, which is demonstrably

11   false, not something that occurred and not something the

12   Court has considered, has not found that that has occurred;

13   yet he was so upset still on January 6th that he said he was

14   going to come back for a second bite at the apple.

15           So in my mind, it was very much an organized

16   attempt to overthrow the government, based on his

17   statements.

18           I look only to the facts as they are before me.

19   And as I see them, he was part of a concerted effort.  You

20   know, he took a bullhorn.  Now, granted, he took it to give

21   a prayer, which -- there's nothing wrong with that.

22   However, when there is a mob and you are part of that mob

23   and you get a bullhorn, it's hard to say you're not part of

24   what was going on.  You were not some wallflower in an

25   otherwise large event.  You were in the thick of things.

1    And that's where he was:  He was truly in the thick of

2    things.

3           You know, that goes to the third point.  You said

4    that knowledge -- that the Government's proved knowledge

5    that [indiscernible] is of special significance.  It's not

6    related to the legitimacy of the government.

7           I certainly agree that whether or not he believes

8    the government is legitimate is totally irrelevant as to

9    whether or not the Government has pled the elements of the

10   offense.

11          Now, I will note that this is not a hearing to

12   determine whether or not the Government has established

13   probable cause.  You certainly can move to dismiss the

14   complaint.  And that's something that could happen at the

15   preliminary hearing, is that you could demonstrate there was

16   not a sufficient basis to find by probable cause that the

17   crime occurred.

18          Yet it's of no matter; we should still consider it

19   if the Defendant is unlawfully held.  Absolutely.  Always.

20   We don't wait to do that.  We do that now, because that is

21   the right thing to do, because it is always wrong to hold

22   someone inappropriately or detain them if justice does not

23   militate towards that, because it is so offensive to our

24   system of justice and our system of democracy, our legal

25   justice system, to detain people pretrial.  It is only in

1    the most extraordinary of circumstances.

2              So I very much [indiscernible] when you say that

3    the Government has not met its elements of the crime.  I

4    find this frankly to be the weakest argument that you've

5    made, Mr. Smith.  I think the other ones, some of them, are

6    quite compelling, thinking about the *Lemon* decision in

7    particular and your first argument.  Here, I just can't get

8    my arms around it, Mr. Smith.

9              And so I don't want to go through a

10   back-and-forth.  I'll just tell you how I ruled, and you're

11   welcome to file on the papers with me or with Chief Judge

12   Howell how, if anything else, he had knowledge that this

13   area is of special significance.  That was the reason they

14   were there on January 6th at the very hour that the

15   Electoral College --

16             MR. NICHOLAS SMITH:  Your Honor, I hate to

17   interrupt you; but just to be clear, the designation of

18   "special significance" under 1752 has to be made.  And I

19   think it's a stipulation that has been made in this case.

20   So "special significance" is not colloquial; it's actually a

21   designation that's been made by some government entity.  And

22   I think there's actually been reporting that there was some

23   [indiscernible] or anger that these events on the 6th had

24   not been so designated an event of special significance.

25             So that's the reason we're pointing that out, your

1    Honor, not to show that the Defendant had knowledge that

2    this was an event of special significance, generally

3    speaking, but that the government in fact had not designated

4    this event as an event of special significance; and

5    therefore, 1752(c)(1)(C) does not apply here on its face.

6              So I think that's the argument we're making, your

7    Honor.

8              So it appears that for the status of 1752(c) in

9    this case, the Government has to allege that Mr. Griffin had

10   the knowledge when he entered this area that an individual

11   protected by the Secret Service, who I understand is not

12   members of Congress, was present in the area where he

13   entered, your Honor.

14             So I don't think this --

15             THE COURT:  I understood your argument.

16             MR. NICHOLAS SMITH:  This is an issue that's not

17   really [indiscernible] on in the general allegations of

18   either the complaint or, you know, general understanding or

19   knowledge of the event that took place.  I've never seen the

20   Government's position on how they [indiscernible] by the

21   statute.  This is not a general argument about whether it's

22   appropriate to cross a barricade or whether there might be

23   some other infraction of DC law.  This is a question about

24   whether or not 1752(c) has been satisfied.

25             And it's clear, I think, if your Honor looks at

1    the charging statement, that there is no allegation that the

2    Defendant knew he entered an area that was covered by

3    1752(c)(1)(A), (B) or (C).

4             So just to be absolutely clear, your Honor, that's

5    the argument we're making.

6             THE COURT:  Understood.

7             I think, as I stated before, I'm not going to --

8             Ms. Iyengar, I don't need to hear from you.

9             I think if you want to brief these issues for the

10   preliminary hearing, that's totally fine.  I think that

11   there's not case law that indicates the definition or, you

12   know, whether or not this is covered.

13            I understand you're saying it was not invoked as a

14   special event.  I think the argument could be made by the

15   Government -- arguably, it's constructive -- but it is

16   irrelevant to me because, as I've indicated, I think that

17   there is no doubt in my mind, in fact, in anyone's mind,

18   that there was a person protected by the Secret Service who

19   was in that building, which is the Vice President of the

20   United States of America.  It is well-known.  In fact,

21   again, the reason for the protest was to disturb and stop

22   the Vice President from certifying the results of the

23   Electoral College.

24            So this is not something which normally is

25   relegated to a civics class that few people would know.  In

1    fact, it was an international news story.

2         So I think that there is a simple-enough basis in

3    fact from just mere common knowledge, let alone the

4    knowledge of, again, why was the Defendant there at that

5    date and time?  It was by his own words to stop the Chinese

6    theft of the election.  Again, I'm not sure what that means.

7    But as I understand from the Government it's his statements,

8    his words.

9         And so how would that stop [indiscernible] from

10   the Vice President, which again, it's true that there was no

11   inquiry upon the Defendant if he knew the Vice President was

12   protected by the Secret Service.  But I think that is a

13   reasonable inference that can be made.  The Government can

14   ask that, and I can order that, that there be judicial

15   notice taken of that.  So I think that answers that.

16        In terms of the blood coming out of the Capitol, I

17   think you make the argument that that didn't happen.  Right?

18   And that's great.  I think we all agree that he did not

19   return.  That is certainly something everyone agrees is to

20   his benefit.

21        However, I don't credit him for that.  He said it

22   after.  If before January 6th he said those things, it would

23   still be incredibly troubling during January 6th.  But after

24   January 6th, he continued to make statements about what

25   would happen and how what happened on the 6th was -- you

1   know, that the job was left undone.  Right?

2           So in my mind, when he made those statements, as

3   inflammatory as they are, and considering the previous

4   statements he makes, to me the only reason he did not

5   return, I can infer -- and that's all I can ever do, is

6   infer from the facts -- is because the National Guard was

7   invoked, the Mayor brought and called for support from the

8   National Guard and it was then placed around the Capitol.

9           The reason that there was no Second Amendment

10  rally, as he indicated, was because it was physically

11  impossible.  Half the bridges to Washington, DC, were

12  literally closed.  People could not get in.  The Metro was

13  shut down.  This was a war zone.  As such, the fortification

14  by the National Guard and by the government precluded any

15  such event from happening.

16          But I don't give him credit for that.  He said

17  that he was going to do it.  And again, that just

18  demonstrates a propensity for violence, because I'm not only

19  looking at violence; I'm looking at whether or not he

20  believes essentially in the rule of law.  And my concern is

21  that, based on his statements and his actions, he's not

22  [indiscernible] the *Lemon* case.  I'll leave it for the

23  pleadings.

24          I understand that you believe that this is core

25  political speech, being able to say the things that he said.

1          I think Ms. Iyengar would [indiscernible] and

2     certainly plenty of people, that saying the only good

3     Democrat is a dead Democrat or the blood running out of the

4     Capitol Building, that that is not.  There are limits on all

5     rights, on the First through the Tenth of the Amendments and

6     all that are in the Constitution, as many others.

7          That's in addition to his actions.  So this is not

8     speech alone.  Speech here motivates my understanding of

9     what his intent was.  What was he trying to do on January

10    6th?  And the Government alleges that this was an attempt to

11    overthrow the government, to stop the lawful progress of the

12    democratic process of which the founders had established.

13         And his statements seem to corroborate that he

14    viewed this as an illegitimate government that he had to

15    take by any means necessary, including violence, to stop,

16    which means to me, I believe, as there continue to be

17    conditions of release that require him to come and show up

18    before me, that he won't listen to those conditions because

19    he may ultimately decide that those conditions are part of a

20    flawed system that he must go by any means to overthrow and

21    disrupt.

22         And so for those reasons, I don't think this is

23    political speech.  It is far from it.  These are actions

24    that were taken that are far outside his First Amendment

25    rights.

1           For those reasons, I would say I find that

2      detention is appropriate and we will have a preliminary

3      hearing on January 8th -- I'm sorry -- February 8th, as

4      discussed.  And at that time, if you want to move to

5      dismiss, I would ask that you file pleadings beforehand in

6      terms of why you think the elements have not been met.  I

7      think it would be helpful, frankly.  Those are not well-trod

8      areas of law.  There is a dearth of case law on much of

9      this.  And I think that both Mr. Smiths make very

10     [indiscernible] legal arguments.  And so it's an opportunity

11     to hear more about those.

12          And perhaps there will not be a finding of

13     probable cause.  I don't know.  We'll have to wait until we

14     get there.

15          Ms. Iyengar, anything from the Government's

16     perspective?

17          MS. IYENGAR:  No, your Honor.

18          THE COURT:   Thank you.

19          Mr. -- I'll go back to Mr. Nicholas Smith,

20     although it looks like Mr. David Smith is going to speak.

21     Either one.

22          MR. DAVID SMITH:  Judge, I just have a question

23     for you.

24          THE COURT:  Sure.

25          MR. DAVID SMITH:  I've never done a Zoom hearing

1    before, believe it or not, in the court.  I'd like to order

2    the transcript of this hearing.  Can you --

3              THE COURT:  Ms. Lavigne-Rhodes will follow up with

4    you offline.  She can help you.  Is that right,

5    Ms. Lavigne-Rhodes?

6              THE COURTROOM DEPUTY:  Absolutely.

7              THE COURT:  She's the best.  She can do anything.

8    She'll follow up with you via email to confirm your ability

9    to get the rush transcript.

10             MR. DAVID SMITH:  Is that your courtroom deputy?

11             THE COURT:  She's my boss, my inspiration.  But

12   yes.  She's also my courtroom deputy.

13             MR. DAVID SMITH:  Great.  Okay.  Should we call

14   her or email her?

15             THE COURT:  She'll email you, if that's all right,

16   Mr. Smith.

17             MR. DAVID SMITH:  Yes.  We'd like to order it as

18   soon as possible in order to have it available for any

19   future court proceeding.

20             THE COURT:  I see the court reporter furiously

21   typing away.  So I'll know that she will -- they'll be able

22   to coordinate your getting that, if not today, immediately.

23             MR. DAVID SMITH:  Thank you so much.

24             THE COURT:  Mr. Nicholas Smith, anything else from

25   your end?

1              MR. NICHOLAS SMITH:  Nothing else.  Thank you for

2     the explanation, your Honor.  Thank you.

3              THE COURT:  Of course.  Yes.  Thank you both.

4              Thank you, everyone.

5              Mr. Griffin, as I said, I know this is obviously

6     not the result you were hoping to hear.  But the legal

7     process will continue.  You'll have your appeal.  You'll

8     have the hearing upcoming.  So we'll go forward with this

9     case and you'll continue, as I said, to be viewed to be

10    innocent because that is what you are under the eyes of the

11    law.

12             So thank you all.  To the parties, thank you for

13    your briefing.  Have a good evening.

14             MR. DAVID SMITH:  Thank you.

15             (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings produced to the

7     best of my ability.

8

9

10                   Dated this 2nd day of February, 2021.

11

12                /s/ Lisa Edwards, RDR, CRR
                  Official Court Reporter
13                United States District Court for the
                    District of Columbia
14                333 Constitution Avenue, NW, Room 6706
                  Washington, DC 20001
15                (202) 354-3269

16

17

18

19

20

21

22

23

24

25